90

DAVIDSON et al. v. UNITED STATES.
No. 2705.

Circuit Court of Appeals, First Circuit.
Jan. 31, 1933.

Daniel T. Hagan, of Providence, R. I. (Rosenfeld & Hagan, of Providence, R. I., on the brief), for appellants.

Charles H. Eden, Asst. U. S. Atty., of Providence, R. I. (Henry M. Boss, Jr., U. S. Atty., of Providence, R. I., on the brief), for the United States.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

On November 2, 1931, the defendants appellants, George Davidson, Patrick Connors, Edmund Sunderland, George Sunderland, Leroy Fitzler, George McGraw, and Percy King were indicted in the federal District Court for Rhode Island. The indictment charged that they did, "on the 9th day of February, A. D. 1930, and continuously and at all times thereafter up to and including the 9th day of August, A. D. 1931, at Tiverton, in the State of Rhode Island and elsewhere, * * * unlawfully, knowingly, wilfully, fraudulently and feloniously conspire, combine, confederate and agree together to commit an offense against the United States, to wit, to violate the Tariff Act of 1930, and particularly section 593 (a) thereof (19 USCA § 1593 (a), by smuggling or clandestinely introducing into the United States, with intent to defraud the revenue of the United States, merchandise which should have been invoiced, to wit, intoxicating liquor containing one-half of one per cent, or more, of alcohol by volume and fit for beverage purposes, without a permit issued therefor as authorized and required in the National Prohibition Act, and the acts amendatory thereof and supplemental thereto (27 USCA), and regulations of the Treasury Department made thereunder. That it was part of said conspiracy that the above named defendants should operate and cause to be operated the American Gas Screw 'Eaglet' from Tiverton, in the State of Rhode Island to various points and places outside of the United States to the Grand Jurors unknown, and by means thereof should unlawfully import and bring into the United States, to wit, to various points in the State of Rhode Island or other points in the United States, the names of which are to the Grand Jurors unknown, large quantities of intoxicating liquor containing more than one-half of one per cent of alcohol by volume and fit for beverage purposes, contrary to

law and without a permit as aforesaid." In the indictment it was further alleged that "in pursuance of said unlawful and felonious conspiracy, combination, confederation and agreement and to effect the object of the same, the said conspirators at the times and places hereinafter mentioned, unlawfully did do the several acts following mentioned in connection with their several names." Then seven distinct overt acts are alleged:

"I. That on or about the 8th day of August, A. D. 1931 the said George Davidson assisted in taking and navigating the American Gas Screw 'Eaglet' from Tiverton, in the State and District of Rhode Island to a point on the high seas, otherwise to the Grand Jurors unknown, for the purpose of obtaining a large quantity of intoxicating liquor."

The remaining six alleged overt acts are the same as the one above set forth, with the exception that, in each, one of the remaining six defendants is named as having on that day assisted in taking and navigating the vessel.

On December 14, 1931, the defendants demurred to the indictment on the grounds that it was faulty (1) "in that it sets up a conspiracy from the ninth day of February, A. D. 1930, to the ninth day of August, A. D. 1931, to violate the Tariff Act of 1930, which act did not become law until June 17, A. D. 1930; (2) in that it "charges a violation of a statute which had not been passed and was not law at the time of the alleged violation"; (3) in that it "charges a conspiracy up to and including the ninth day of August, A. D. 1931 with overt acts occurring on the eighth day of August, A. D. 1931"; (4) in that it "sets forth that the overt acts preceded the conspiracy"; and in that it "contains no charges of any overt acts subsequent to the conspiracy."

On December 15, 1931, after hearing, the demurrer was overruled, and the defendants excepted. December 16, 1931, the defendants filed a motion to dismiss and for cause stated: "1. That on the ninth day of August, A. D. 1931, they were all arrested on the high seas for the same violation alleged in this indictment, conspiracy to violate section 593 (b) of the Tariff Act of 1930, were taken by officers of the United States Navy into New Bedford in the District of Massachusetts, where they were arraigned on such charge, and were all released on bail"; and that "on the twenty-seventh day of August, 1931, said charges were dismissed by the United States Commissioner Lillie." "2. That this court has no jurisdiction of said alleged crime, because the said defendants during said alleged crime were arrested and taken into another district from the high seas, which other district acquired jurisdiction of said alleged crime." After hearing, the motion was denied, subject to exception.

December 14, 1931, the defendants Davidson, Connors, Fitzler, McGraw, and King were arraigned, and each pleaded not guilty. December 29, 1931, the defendants George and Edmund Sunderland were arraigned, and each pleaded not guilty.

The indictment as drawn contained a second count, but, March 18, 1932, on defendants' motion that the government should be required to elect on which count it would proceed, count 2 was dismissed by the court.

A trial having been had, the jury returned a verdict of guilty as to each defendant on count 1. March 24, 1932, Connors and King were each sentenced to pay a fine and costs of $400; Edmund and George Sunderland and McGraw were each sentenced to pay a fine and costs of $300; Davidson was sentenced to six months' imprisonment from and after March 24, 1932, in the Providence county jail; and Fitzler was sentenced to a term of three months from March 24, 1932, in the Providence county jail.

At the close of the government's evidence, the defendants moved for a directed verdict. This motion was denied, subject to exception; and at the conclusion of their case they renewed their motion for a directed verdict, which was also denied, subject to exception.

In their assignments of error the defendants complain that the court erred (1) in overruling the demurrer; (2) in denying their motion to dismiss the indictment; (3) in denying their motion for a directed verdict at the conclusion of the government's evidence; and (4) in denying their motion for a directed verdict at the conclusion of all the evidence.

■ The court did not err in overruling the defendants' demurrer. The Tariff Act of 1930, effective June 17, 1930, was in effect when the acts charged in the indictment were committed and when the indictment was found. All the acts alleged in the indictment in furtherance of the crime charged occurred after June 17, 1930, and before August 9, 1931, throughout which time the conspiracy is alleged to have been in existence. United States v. Baker (D. C.) 243 F. 741, 743.

The position is also taken that the indictment contains no charge of an overt act subsequent to the conspiracy, but only overt acts

preceding the conspiracy. This manifestly is not so. The defendants take nothing by their first assignment of error.

■ Their second assignment is likewise without merit. The fact that the defendants, after they were arrested on the high seas, were taken by the officers of the United States Navy into New Bedford in the district of Massachusetts and were there charged with conspiracy to violate section 593 (b) of the Tariff Act of 1930, 19 USCA § 1593 (b), and that the charges were dismissed, is of no consequence. The conspiracy there charged was to violate section 593 (b) of the Tariff Act, while the conspiracy here charged is to violate section 593 (a) of the Tariff Act; and to render the defendants liable in the Massachusetts district for conspiracy to violate section 593 (b), it was essential to charge a conspiracy, the formation of which or an overt act in furtherance of it occurred within the district of Massachusetts, which would be an entirely different conspiracy, even though it was to violate the provisions of section 593 (a). All that the dismissal of the complaint before the Commissioner in Massachusetts amounted to was that he did not find probable cause for holding them for the grand jury.

■ The remaining contention under this assignment of error is, that the District Court of Rhode Island was without jurisdiction of the alleged crime because the defendants were arrested on the high seas and taken into the Massachusetts district; that that district had jurisdiction of the alleged crime. We can hardly see how counsel feel called upon to make such contention. The indictment in this case does not charge the defendants with the commission of a crime on the high seas. It may be conceded that, if it did, the District of Rhode Island would not have jurisdiction (venue) in the absence of the defendants' consent or waiver; it not being the district into which they were first brought after arrest. But the indictment charges a crime committed in the district of Rhode Island; not on the high seas or in the district of Massachusetts.

■ The third assignment of error relates to the motion for a directed verdict at the close of the government's evidence. If the defendants had then closed their case we would be called upon to pass on the question raised by this assignment. But by not resting and going on and introducing testimony, they waived their exception to the overruling of this motion.

■ The fourth assignment of error is the only real question in the case, and that is whether the denial of their motion for a directed verdict at the close of all the evidence was error. This involves an inquiry as to whether there was substantial evidence from which the jury were warranted in finding that the defendants had entered into a conspiracy in the district of Rhode Island and thereafter committed an overt act in furtherance of the conspiracy either within the district of Rhode Island or elsewhere.

The evidence tended to show that, on the late afternoon of August 8, 1931, the Eaglet was moored at Seaconnet Fish pier on the Seaconnet River, Tiverton, R. I.; that Davidson, her owner, Fitzler, her engineer, Connors, her captain, King, the two Sunderlands, and McGraw, members of her crew, were all on board of her at the Fish pier when she left to go down the Seaconnet River; that the government patrol boat 235 was then at the mouth of that river and half a mile off shore; that it (the patrol boat) stopped and looked over the Monalola, a boat that was on its way out to sea; that while the Monalola was tied up to the patrol boat the Eaglet came down the river headed out to sea, tied up to the Monalola at 5:18 p. m., and was also looked over by the patrol boat; that both these boats left the patrol boat at 5:25 and headed out to sea; that no liquor or sacks of liquor were on the Eaglet when she left the Fish pier or when she left the patrol boat at 5:25; that the Eaglet sailed directly out to sea for two or three hours, until Fitzler, the engineer, got a bell to stop; that on his looking out the hatch he saw they were alongside another boat; that he went below to work on his engine; that he later heard walking and talking and stuff hitting the deck; that after getting a bell to go ahead, the next thing he knew or heard was when bullets came through the side of the boat; and that he was then on his way home to Rhode Island. It further appears that patrol boat 813, on August 8, 1931, at about 10:45 p. m., first sighted the Eaglet eight or ten miles off Seaconnet (Tiverton) and bound in a northerly direction on a course that would bring her into Seaconnet River, running without lights, and having sacks loaded on her deck; that the Eaglet was signaled to heave to, and, on failing to do so, machine gun bullets were fired across her bow, and, on her continuing to disobey the signals, bullets were fired into her hull; that the Eaglet caught fire, and, after the crew was removed, sank; that nine sacks of liquor were also removed; that there were about 350 sacks of liquor on board her; that the liquor was Canadian whisky, an analysis of which showed that it contained 45.3 per cent. of al-

cohol by volume; that Fitzler, the engineer, had been on board the Eaglet four or five months and impliedly admitted that he knew when they started out that day from the Fish pier they were going out for liquor; that he had made three or four trips for liquor; that the Eaglet was unquestionably a rumrunner; that Davidson, the owner, testified that the members of the crew had been on the boat before that day, and "were all acquainted with her," indicating that they all knew what she was; that he would not pay the crew for their services when they went off with him on a pleasure trip, but he would pay them when they went out and "came back with a load of liquor"; that, on the day in question, on the way back, they had on board 300 to 350 cases; and that before starting that day, he had a few thousand dollars in his pocket. Davidson, however, testified that, when they left the Fish pier at Tiverton, he did not intend to go out and get a load of liquor; that he, the engineer, the captain, and the crew boarded the Eaglet to overtake the Monalola, seen going down the river past the Fish pier, so that King might collect some money due him from a person on the Monalola, and when they reached the Monalola alongside the Coast Guard boat 235, King collected his money; that the Monalola suggested a race and they raced the Monalola out to sea; that they raced out until finally they lost the Monalola and, being then out some ten or twelve miles, he then first decided to get the liquor; that he then said, when "all were banded together," "Let us see if we can find some"; that he also said, "Look to see if we can find some"; and that he intended to bring the liquor to the shores of the United States if they could not get rid of it to some other boat.

The evidence, therefore, discloses the following facts: That the Eaglet, a vessel engaged in running liquor from the high seas into the United States, was at the Fish pier at Tiverton on the afternoon of August 8, 1931; that her crew consisting of her captain, engineer, and four other men were there; that the owner was there; that the crew were paid for services on this vessel only when they went out on the high seas and obtained a cargo of liquor; that the owner of the boat on that day had in his pocket several thousand dollars—the means with which to purchase liquor; that, in this situation, he called the crew together to board the vessel; that they boarded the vessel, went out on the high seas and obtained a cargo of liquor; that later, on the night of the same day, the vessel was found running without lights, with the crew and owner on board, and loaded with

some 350 cases of Canadian whisky, and well on her way to Tiverton; that, at this time, she was overhauled, the owner and crew arrested, and some of the liquor seized.

We think the evidence was adequate and justified a finding that the owner and crew of the Eaglet had entered into an understanding, before or at the time they left Tiverton, that they would go out on the high seas, obtain a load of liquor, and bring it into the district of Rhode Island. The jury was not required to believe the verbal denial of Davidson, the owner, that he had no intention of getting liquor until he had gone some ten miles out to sea, in view of the other evidence in the case.

The judgments of the District Court are affirmed.